## The Wesley A. Gove.[1]

*District Court, D. Massachusetts.* April 6, 1886.)

COLLISION — DIMINISHED VISION DEMANDS DIMINISHED SPEED — RULES OF THE ROAD — CONSTRUCTION OF — NINETEENTH RULE — STEAM-WHISTLE — INSPECTORS' RULES — HALF DAMAGES.

A steamer, shortly after backing out from her wharf, was obliged to stop and reverse in order to thereby avoid colliding with a schooner. While lying motionless, she was run into by a tug. The latter vessel was, at the time, crossing the steamer's track from starboard, so that the position of the vessels was that the steamer had the tug on her own starboard side. *Held,* that it was the duty of the tug, under the circumstances, to have kept out of the way of the steamer, notwithstanding the fact that if both vessels had been under way their courses would have been crossing, and their respective obligations reversed. The steamer being motionless, and without the power to alter her position immediately, must be considered as a vessel at anchor, and rule 19 is therefore inapplicable. *Held,* that if the circumstances were such as to obstruct partially the range of vision, it was incumbent on the tug to have stopped or slowed. *Held* that, both by usage and law, "in a crowded harbor, in the vicinity of wharves, steamers are required to sound their whistles as often as may be necessary to guard against collision," and that the steamer, notwithstanding her position, was at fault in this regard.

In Admiralty.

*L. S. Dabney,* for libelant.

*J. C. Dodge & Sons,* for claimant.

NELSON, J. This case was a libel for collision, by the Boston & Hingham Steam-boat Company, as owner of the Rose Standish, a passenger steam-boat plying between Boston, Pemberton Landing, and Strawberry Hill, against the steam-tug Wesley A. Gove. On the twenty-fourth of August, 1884, at 5:15 P. M., the Rose Standish backed out of her dock on the north side of Rowe's wharf, in Boston, with her stern to the southward, on her afternoon trip down the harbor, having on board about 100 passengers, and proceeded in a north-easterly direction to pass round a group made up of a dredging boat, several mud scows, and a tug-boat, employed in dredging the flats, and stationed some 200 yards off Central wharf, the second wharf north of Rowe's wharf. As she was rounding the dredging group under a port wheel, her engine was stopped and reversed to avoid a schooner on her port bow bound out. She had gone past the dredger about three lengths, and had come nearly or quite to a standstill, when the tug, which was crossing the harbor from the South Boston side, ran into her starboard bow at the forward gangway, and sunk her.

There is sufficient proof that the Rose Standish stopped and reversed to avoid the schooner, though this is denied by the owners of the tug, and the schooner does not appear to have been seen by the men on the tug. The fact is proved by the testimony of a large num-

Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

ber of witnesses who were at the time on the Rose Standish, or on the wharf, in positions to observe the situation, and I do not think they can be mistaken. The claim of the tug is that under rule 19, then in force, she had the right of way, being on the starboard side of the Rose Standish, and that it was the duty of the latter to keep out of her way. But the stopping of the Rose Standish was made necessary by the exigencies of her navigation, and this the tug ought to have seen, and governed her own movements accordingly. In such a situation the Rose Standish was not a crossing vessel, within the rule; but being stationary, and without power to alter her position immediately, was rather like a vessel at anchor or moored to a wharf, and other vessels, having in view her situation, were bound to avoid her. The master of the tug admits that the Rose Standish was not seen from the tug until too late to prevent the collision by any maneuver possible. He says that his own view was obstructed by the mud-digger, and by the westerly sun shining in his eyes from over the port bow. Both these excuses are manifestly frivolous. If for either reason he had not a clear view over his port bow towards the wharves, from which direction vessels were likely to be coming at any moment, he should have stopped or slowed. The afternoon was bright and clear, and his failure to see the Rose Standish could only have been caused by inattention.

As I read the evidence, the conduct of the tug was this: She had no lookout forward. Her master was alone in the pilot-house, at the wheel, and was the only person on board attending to the navigation of the boat. When he first saw the Rose Standish she was over his port bow, not 30 yards away. As he caught sight of her, his first thought was that she was coming at full speed, and was about to run him down; and to save his own boat, though at the expense of the other vessel, he gave the signal to the engine-room to stop and back, put his wheel hard to starboard, and plunged into her.

The owners of the tug also allege that the Rose Standish did not sound her whistle to give warning of her approach. This is admitted by the Rose Standish. Her master testifies that when he rang to stop and back to keep out of the way of the schooner, the pilot called his attention to the tug, then 600 feet away, and said to him he "thought she would run into us." To this the master replied, "I guess not," and went on attending to the schooner. For his failure to give the signal at this time he assigns no reason. For not giving it when his boat had come to a stand-still, he says he did not understand he was bound to do so, his boat not being "in motion or running." In the situation in which he was placed he was required, both by the regulations of the supervising inspectors and the usages of the port, to sound his whistle. By the inspectors' rules, in a crowded channel, or in the vicinity of wharves, "steamers must be run and managed with great caution, sounding the whistle as may be necessary, to guard against collision or other accidents." Had the Rose Standish ob-

served this rule, the attention of those on the tug would undoubtedly have been aroused in season to stop or pass astern. She had no right to presume that the tug would see and avoid her if she failed to observe the precautions prescribed by law and usage. The negligence of the tug affords no excuse for the negligence of the steam-boat.

As I find both vessels at fault, the libelant is entitled to a decree for one-half the damages. Ordered accordingly.